UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LUKE'S CATERING SERVICE, LLC,
  *d/b/a Lucarelli's Banquet Center*,
BUFFALO ROAD CATERING, INC.,
  *d/b/a Avanti Mansion*,
CLINICAL RESEARCH SOLUTIONS, INC.,
  *d/b/a Notting Hill Farm*,
KLOC'S GROVE INCORPORATED,
ROSEBUD STABLES, LLC,
  *d/b/a Rosebud Estate Weddings*, and
O.P.T. MARKETING, INC.,
  *d/b/a O'Brien's Sleepy Hollow*,

     Plaintiffs,

  v.

ANDREW M. CUOMO,
  *In his official capacity as Governor of*
  *the State of New York*,
LETITIA A. JAMES,
  *In her official capacity as the Attorney*
  *General of the State of New York*,
EMPIRE STATE DEVELOPMENT CORPORATION,
ERIE COUNTY DEPARTMENT OF HEALTH, and
CATTARAUGUS COUNTY DEPARTMENT OF HEALTH,

    Defendants.

**DECISION AND ORDER**
20-CV-1086S

## I. INTRODUCTION

When faced with a society-threatening epidemic, state officials are empowered to implement emergency protective measures that infringe federal constitutional rights. They may generally do so at their sole discretion and for so long as is necessary.   And as long as the emergency measures bear some real or substantial relation to the threatening epidemic and are not unquestionably a plain invasion of rights, the efficacy

1

and wisdom of those measures are not subject to judicial second-guessing.

The State of New York faces a society-threatening epidemic in COVID-19. Beginning in March 2020, with his declaration of a disaster emergency throughout the state, New York Governor Andrew M. Cuomo has issued a series of emergency protective measures in the form of Executive Orders aimed at combatting COVID-19 and the public-health crisis it has created.   Those measures have included imposing quarantines, mandating workforce reductions, closing schools, requiring face-coverings, and restricting activities of all types.

The plaintiffs here—six event and banquet centers that host large gatherings—challenge and seek to enjoin Defendants from continuing to enforce one of those emergency measures: Executive Order 202.45 and its progeny, which imposes a temporary 50-person limit on non-essential gatherings.   Fiscally reeling from this ban that has effectively shut them down since March 2020, Plaintiffs understandably seek this Court's intervention in a bid to save their struggling businesses and avoid insolvency.

But as explained herein, this Court is constrained by decades-old Supreme Court precedent that requires great deference to the State's police power in times of crisis. Because the issuance of Executive Order 202.45 properly falls within this power, Plaintiffs' pending motion for preliminary injunction will be denied, Defendants' cross-motions to dismiss will be granted, and Plaintiffs' will be afforded leave to file an amended complaint.

## II. BACKGROUND

The six plaintiffs are event, banquet, and catering facilities that serve as private

venues for weddings, religious services and celebrations, bridal and baby showers, family reunions, political events, and other large gatherings.   (Complaint, Docket No. 1, ¶¶ 3-8, 20.)   They are each "non-essential" businesses under the Governor's Executive Orders and are subject to the 50-person limitation on "non-essential" gatherings, which they allege has left them on the verge of insolvency.   (Id. ¶¶ 23, 35.)

Defendants Andrew M. Cuomo and Letitia A. James are the Governor and Attorney General of the State of New York, respectively.   (Id. ¶¶ 9, 10.)   They are each sued in their official capacity.   (Id.)   Defendant Empire State Development Corporation is a New York State public benefit corporation.   (Id. ¶ 11.)   Defendants Erie County Department of Health and Cattaraugus County Department of Health are municipal corporations within the State of New York.   (Id. ¶¶ 12, 13.)   Each defendant is alleged to have interpreted and enforced Governor Cuomo's Executive Orders, including the 50-person limitation on "non-essential" gatherings.   (Id. ¶ 1.)

### A.   COVID-19 and Governor Cuomo's Executive Orders

COVID-19 needs little introduction.   It is the potentially lethal respiratory disease caused by a novel coronavirus for which there is no known cure, no effective treatment, and no vaccine.   See S. Bay United Pentecostal Church v. Newsom, __ U.S. __, 140 S. Ct. 1613, 1613, 207 L. Ed. 2d 154 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief).   Its rapid person-to-person spread has caused a global pandemic the likes of which has not been seen since 1918.   And it continues to grip this nation, with new infections and deaths reported daily.

In response to this public-health crisis, the New York Legislature amended §§ 20

3

and 29-a of the New York Executive Law in early March 2020 to grant the Governor broad powers to "manage, prepare, respond to and contain the threat posed by" the virus. (Complaint, ¶ 25.)   Shortly thereafter, Governor Cuomo declared a disaster emergency in New York on March 7, 2020, with the President of the United States proclaiming a national emergency on March 13, 2020.   See N.Y. Exec. Order No. 202 (March 7, 2020);[1]  Proclamation No. 9994, 85 Fed. Reg. 15,337-38 (March 13, 2020); Complaint, ¶ 29.   As Plaintiffs themselves recognize, the outbreak poses a significant and ongoing danger to the public health and welfare.   (Complaint, ¶ 50.)   To date, there have reportedly been 445,881 cases and 32,611 deaths in New York.[2]

After declaring the state-wide disaster emergency, Governor Cuomo issued a series of Executive Orders that he, State Attorney General James, the Empire State Development Corporation, and the Erie and Cattaraugus Departments of Health allegedly interpreted and enforced.   (Id. ¶¶ 1, 24, 31, 49.)   The early Executive Orders canceled or limited public gatherings, required workforce reductions at "non-essential" businesses and entities, and precluded any place of business or accommodation from operating at greater than 50% occupancy or seating capacity.   (Id. ¶¶ 32-34, 36, 37, 39; N.Y. Exec. Order No. 202.1 (March 12, 2020).)   Enforcement of these orders came through other Executive Orders that made it a violation of the local building code for any facility to permit a prohibited gathering and a violation of the public health law for any individual to

---

1 All Executive Orders cited herein are available at https://www.governor.ny.gov/executiveorders (last visited August 26, 2020) and most are also included as exhibits to Plaintiffs' complaint.

2 See https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html (last visited September 10, 2020, at 12:04 p.m.).

participate in a prohibited gathering—with possible fines up to $1,000.   (Complaint ¶ 38.)

On May 21, 2020, Governor Cuomo issued Executive Order 202.32, which relaxed the prohibition on "non-essential" gatherings by permitting gatherings of 10 or fewer individuals for any religious service or ceremony, or for the purposes of any Memorial Day service or commemoration, provided that social-distancing, cleaning, and disinfection protocols required by the New York State Department of Health were observed.   (Id. ¶ 40.)   The following day, the Governor permitted such gatherings under the same conditions for any lawful purpose in Executive Order 202.33.   (Id. ¶ 41.)

On May 28, 2020, Governor Cuomo began "Phase 1" of New York's reopening plan with Executive Order 202.34.   (Id. ¶ 42.)   While the 10-person limitation on "non-essential" gatherings remained in place, certain businesses and industries in regions designated for reopening in "Phase 1" (including Western New York) were permitted to operate within certain restrictions and guidelines.   (Id.)

Approximately one week later, Governor Cuomo extended the prohibition on "non-essential" gatherings of more than 10 people in Executive Order 202.38 but carved out houses of worship, which were permitted to operate at 25% of their indoor capacity, provided that the house of worship was in a "Phase 2" reopening region and that all required social-distancing, cleaning, and disinfection protocols were observed.   (Id. ¶ 43.)

This Executive Order also permitted restaurants to begin serving food and beverages on-premises but only in outdoor spaces, contingent on adherence to all applicable New York Department of Health guidance.   See N.Y. Exec. Order No. 202.38

5

(June 6, 2020).   The next day, the Governor limited Executive Order 202.38 to apply only to restaurants in regions that had reached "Phase 2" of reopening.   See N.Y. Exec. Order No. 202.39 (June 7, 2020).   Shortly thereafter, the Governor authorized the resumption of indoor dining at no greater than 50% capacity in restaurants located in "Phase 3" reopening regions.   See N.Y. Exec. Order No. 202.41 (June 12, 2020).

On June 15, 2020, the Governor issued Executive Order 202.42, which increased permitted "non-essential" gatherings to 25 or fewer individuals, provided that the gatherings were in regions that had reached "Phase 3" of reopening and that all preventative protocols were observed.   (Complaint ¶ 44.)

About one week later, the Governor issued Executive Order 202.45, which again increased permitted "non-essential" gatherings to allow

> gatherings of fifty (50) or fewer individuals for any lawful purpose or reason, so long as any such gatherings occurring indoors do not exceed 50% of the maximum occupancy for a particular indoor area, and provided that the location of the gathering is in a region that has reached Phase 4 of the State's reopening, and provided further that social distancing, face covering, and cleaning and disinfection protocols required by the Department of Health are adhered to.

(Id. ¶ 45; N.Y. Exec. Order No. 202.45 (June 26, 2020).)   This Executive Order has twice been extended and now expires on September 19, 2020.   (Complaint ¶ 47; N.Y. Exec. Order No. 202.55 (Aug. 5, 2020); N.Y. Exec. Order No. 202.57 (Aug. 20, 2020).)

## B.   The State's Justification for the Executive Orders

Defendants have submitted the Declaration of Howard A. Zucker, M.D., J.D., the Commissioner of the New York State Department of Health, who is charged with leading

New York's response to the COVID-19 pandemic.   (Declaration of Howard A. Zucker, M.D., J.D. ("Zucker Decl."), Docket No. 29-9, ¶ 1.)   Zucker personally participated in the development of the Executive Orders at issue.   (Id. ¶ 37.)   He explains that the Executive Orders were developed and issued in consultation with a team of epidemiologists in direct response to the COVID-19 threat to reduce the risk of person-to-person transmission during "super-spreader" events, particularly at indoor venues. (Id. ¶¶ 17, 37, 39.)

A "super-spreader" event is one in which a single person infects a disproportionate number of other individuals.   (Id. ¶ 17.)   The hallmarks of such an event, according to Zucker, are its size, the length and nature of expected interactions, and the length of the event itself.   (Id. ¶ 18.)   The more people with whom an individual interacts, and the longer those interactions, the higher the risk of transmission.   (Id.)   Transmission risks also increase when large groups arrive together, join for communal purposes, share facilities, spend many hours together, and depart together.   (Id. ¶¶ 19, 22.)   Scientists believe that such "super-spreader" events play an oversized role in the transmission of COVID-19, with some, according to Zucker, estimating that 10% of the cases may be responsible for 80% of the transmissions.   (Id.)   Limiting large events therefore reduces the risks of transmission, which is why the Executive Orders have placed size restrictions on gatherings.   (Id. ¶ 18.)

C.   **Plaintiffs' Claims**

Plaintiffs maintain that Governor Cuomo's 50-person limitation on "non-essential" gatherings— which persists despite the Governor's declaration in Executive Order 202.47

that New York has one of the lowest infection rates in the country and is on track to contain COVID-19—has effectively shut them down and left them unable to conduct any meaningful business.   (Complaint, ¶¶ 52, 53, 55.)   They allege that despite being similarly situated to restaurants,[3] which Defendants permit to operate at 50% capacity, they are not subject to the same operating conditions, an inequity that has placed them on the brink of insolvency.   (Id. ¶¶ 23, 53.)

Plaintiffs maintain that implementation and enforcement of the 50-person limitation violates their federal and state rights.   (Id. ¶ 2.)   They bring nine causes of action.   The first six, brought pursuant to 42 U.S.C. § 1983, allege violations of the following federal constitutional provisions: (1) Fourteenth Amendment Equal Protection Clause (id. ¶¶ 57-70); (2) Fifth and Fourteenth Amendment Substantive Due Process Clauses (id. ¶¶ 71-80); (3) Fifth and Fourteenth Amendment Procedural Due Process Clauses (id. ¶¶ 81-87); (4) the Commerce Clause (Art. 1, § 8, Cl. 3) (id. ¶¶ 88-95); (5) the Contracts Clause (Art. 1, § 10, Cl. 1) (id. ¶¶ 96-103); and (6) Fifth Amendment Takings Clause (id. ¶¶ 104-117).   The seventh cause of action asserts a state constitutional equal protection claim under Article 1, § 11 of the New York Constitution.   (Id. ¶¶ 118-124.)   The eighth cause of action alleges a violation of N.Y. Exec. L. § 29-a.   (Id. ¶¶ 125-132.)   The final cause of action seeks attorney's fees and costs under 42 U.S.C. § 1988.   (Id. ¶¶ 133-136.)

### D.   Procedural History

Plaintiffs filed their motion for preliminary injunction together with their complaint

---

3 Plaintiffs claim similarity to the "restaurant and bar industry."   (Complaint, ¶ 61.)   For ease of reference, this Court refers to restaurants only, with the intent that this reference includes, where applicable, the bar industry.

on August 14, 2020.   (Docket No. 4.)   After assignment of the case here on August 19, 2020, this Court conducted a conference with counsel on August 25, 2020, at which a briefing schedule was discussed and issued.   (Docket Nos. 8, 14, 26.)   Defendants cross moved to dismiss (Docket Nos. 23, 27, 29), with briefing on all motions concluded on September 3, 2020.   In the absence of a need for a hearing or oral argument, this Court took the motion under advisement at that time.

### III. MOTION FOR PRELIMINARY INJUNCTION

### A.    Preliminary Injunction Standard

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."   Univ. of Tex. v. Camenisch, 451 U.S. 390, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981).   It is an extraordinary and drastic remedy; one not awarded as a matter of right or entitlement.   See Munaf v. Geren, 553 U.S. 674, 689-90, 128 S. Ct. 2207, 171 L. Ed. 2d 1 (2008); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982).

A party seeking a preliminary injunction to enjoin governmental action taken pursuant to a statute, as Plaintiffs seek here, must demonstrate that (1) he or she is likely to succeed on the merits, (2) he or she will suffer irreparable harm absent injunctive relief, (3) the balance of equities tips in his or her favor, and (4) the issuance of an injunction is in the public interest.   See Yang v. Kosinski, 960 F.3d 119, 127 (2d Cir. 2020) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) and Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 143 (2d Cir. 2016)).

9

But where, as here, a party seeks a "mandatory preliminary injunction"—one that seeks to modify the status quo—and where issuance of the requested injunction will provide the party substantially all the relief it seeks, a heightened standard applies.   In such a case, the party must demonstrate a "clear or substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm.   Yang, 960 F.3d at 127-28 (citations omitted).   Requiring such a heightened showing is consistent with the principle that "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly."   Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995).

## B.    The Parties' Arguments

Plaintiffs argue that they are likely to succeed on the merits of their Equal Protection and Takings Clause claims.   Relying on DiMartile v. Cuomo, they argue that there is no rational basis for Defendants to treat them differently than restaurants, which are not subject to the 50-person limitation and instead permitted to operate at 50% capacity.   See 1:20-CV-0859 (GTS/CFH), 2020 WL 45587121, at *8 (N.D.N.Y. Aug. 7, 2020) (enjoining enforcement of the 50-person limitation).   They further argue that Defendants have selectively enforced the 50-person limitation by permitting gatherings in excess of 50 people for graduations, religious services, and protests, yet prohibiting them from hosting events in excess of 50 people at their facilities.   As to their Takings Clause claim, Plaintiffs maintain that Defendants' enforcement of the Executive Order has deprived them of all meaningful economic use of their private property, requiring just

10

compensation.   Plaintiffs further argue that they will suffer irreparable harm to their constitutional rights and the solvency of their businesses if enforcement of the 50-person limitation is not enjoined.   Finally, Plaintiffs maintain that the balance of equities and the public interest weigh in their favor, since their economic livelihoods are at stake.

In response, Defendants argue that Plaintiffs are neither likely to succeed on the merits of their claims nor to suffer irreparable injury.   They argue that because the 50-person limitation is an exercise of the State's police power, it is squarely protected by the Tenth Amendment and permissible under the deferential standard set forth in <u>Jacobson v. Massachusetts</u>.   197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905).   In addition, Defendants argue that Plaintiffs are unlikely to succeed on their Equal Protection and Takings Clause causes of action because they fail to state claims upon which relief can be granted.   Moreover, Defendants contend that Plaintiffs' request for compensatory damages is an admission that money damages will make them whole, which precludes a finding of irreparable harm.   Finally, Defendants argue that the balance of equities and the public interest tip in favor of their continuing efforts to combat the virus and protect public health.

C.   **Analysis**

1. **Plaintiffs do not demonstrate a clear or substantial likelihood of success on the merits of their claims.**

a.   <u>**Jacobson**</u> **Review**

In <u>Jacobson v. Massachusetts</u>, decided more than 100 years ago, the United States Supreme Court developed the framework governing emergency public health and

public safety measures.  Considering a Massachusetts mandatory-vaccination statute enacted to combat a smallpox epidemic, the Court rejected Jacobson's Fourteenth Amendment claim that the law violated his right to personal autonomy.  Jacobson, 197 U.S. at 29.  It instead found that "the liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint."  Jacobson, 197 U.S. at 26.

In so finding, the Court defined the expanse of the State police power, holding that "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."  Jacobson, 197 U.S. at 29.  Reserved to the States under the Tenth Amendment, the police power encompasses such power and authority reasonably necessary to "guard and protect" public health and public safety, including protecting communities "against an epidemic of disease which threatens the safety of its members."  Id. at 27, 38; see also Barnes v. Glen Theatre, Inc., 501 U.S. 560, 569, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991) ("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals . . . .").

As relevant here, State officials have especially broad authority when they "undertake to act in areas fraught with medical and scientific uncertainties."  S. Bay United Pentecostal Church, 140 S. Ct. at 1613 (involving temporary numerical restrictions on public gatherings to combat COVID-19); see also Legacy Church, Inc. v. Kunkel, No. CIV 20-0327 JB/SCY, 2020 WL 1905586, at *30 (D.N.M. Apr. 17, 2020) ("when the state

faces a major public health threat, . . . its Tenth Amendment police and public health powers are at a maximum").   As the Fifth Circuit succinctly puts it: "<u>Jacobson</u> instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency."   <u>In re Abbott</u>, 954 F.3d 772 (5th Cir. 2020) (emphasis in original).

But the police power is not absolute.   The <u>Jacobson</u> court recognized that "the police power of a state . . . may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression."   <u>Jacobson</u>, 197 U.S. at 38.   Circumscribed judicial review is therefore employed to ensure that actions taken under the guise of the police power do not invade federal authority or violate rights secured by the Constitution.   <u>See id.</u> at 28.

Under the highly deferential <u>Jacobson</u> standard, courts are authorized to review only whether "a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law."   <u>Jacobson</u>, 197 U.S. at 28, 31 (citations omitted); <u>see also</u> <u>DiMartile</u>, 2020 WL 45587121, at *8 (discussing the police power in relation to the COVID-19 pandemic). This review encompasses "asking whether power has been exercised in an 'arbitrary, unreasonable manner,' or through 'arbitrary and oppressive' regulations."   <u>In re Abbott</u>, 954 F.3d at 784 (citing <u>Jacobson</u>, 197 U.S. at 28, 38); <u>see also</u> <u>Lawton v. Steele</u>, 152 U.S. 133, 136, 14 S. Ct. 499, 38 L. Ed. 385 (1894) ("To justify the state in thus interposing its authority in behalf of the public, it must appear—First, that the interests of the public

generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.").

This limited review, however, does not permit courts to pass judgment on the "wisdom and efficacy" of the emergency measures implemented.   In re Abbott, 954 F.3d at 783.   To do so would impermissibly "usurp the functions of another branch of government."   Jacobson, 197 U.S. at 28.   Accordingly, where state officials act within their authority, they "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people."   S. Bay United Pentecostal Church, 140 S. Ct. at 1613-14 (citing Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 545, 105 S. Ct. 1005, 83 L. Ed. 2d 1016 (1985)); see also Jacobson, 197 U.S. at 35 ("no court . . . is justified in disregarding the action of the legislature simply because in its or their opinion that particular method was—perhaps, or possibly—not the best").

### b. **Jacobson** review applies.

"[States] undoubtedly ha[ve] a compelling interest in combating the spread of COVID-19 and protecting the health of [their] citizens."   S. Bay United Pentecostal Church, 140 S. Ct. at 1614 (Kavanaugh, J., dissenting from denial of application for injunctive relief).   Here, Plaintiffs concede that the COVID-19 outbreak poses a substantial and ongoing danger to society (Complaint, ¶ 50), and that Governor Cuomo issued his Executive Orders limiting "non-essential" gatherings to 50 or fewer individuals in response to this pandemic (id. ¶ 24).   Plaintiffs further concede that Governor Cuomo's

Executive Orders are issued pursuant to New York Executive Law 29-a, which was specifically amended "to allow for the protection of the health and safety of New Yorkers due to the threat of the novel coronavirus."   (Id. ¶ 27.)   This Court therefore finds that Defendants are acting within their police power to protect the public health and public safety.   The State's emergency measures are therefore subject to Jacobson review.[4] See In re Abbott, 954 F.3d at 785 (faulting the district court for "ignor[ing] the [Jacobson] framework governing emergency public health measures"); In re Rutledge, 956 F.3d 1018, 1028 (8th Cir. 2020) ("[T]he district court's failure to apply the Jacobson framework produced a patently erroneous result.")

State action taken pursuant to the police power is upheld under Jacobson unless it has "no real or substantial relation" to protecting public health or public safety or is "beyond all question, a plain palpable invasion of rights."   See Jacobson, 197 U.S. at 28, 31; Ass'n of Jewish Camp Operators v. Cuomo, 1:20-CV-687 (GTS/DJS), 2020 WL 3766496, at *7-10 (N.D.N.Y. July 6, 2020) (applying the Jacobson standard to plaintiffs' challenge to COVID-19-related Executive Orders).   Plaintiffs have not demonstrated a

---

4 While somewhat unclear, Plaintiffs seem to suggest that Jacobson review does not apply or should be modified in some way.   They argue that the science surrounding the smallpox disease and vaccine at issue in Jacobson was known, whereas the science here is developing, and that Jacobson involved a statute passed by the state legislature, not an Executive Order.   (Reply Memorandum of Law, Docket No. 33-9, pp. 6-8, 12-16.)   Whatever the intent of these distinctions, the Jacobson standard for assessing state measures taken in response to an ongoing public-health emergency clearly applies.   See Martin v. Warren, 20-CV-6538 CJS, 2020 WL 5035612, at *19 (W.D.N.Y. Aug. 26, 2020) (applying Jacobson in the course of denying request to enjoin public-gathering restriction partially intended to prevent the spread of COVID-19); Page v. Cuomo, 1:20-CV-732, 2020 WL 4589329, at *8 (N.D.N.Y. Aug. 11, 2020) (applying Jacobson and noting that while Jacobson has its detractors, "courts across the country have nearly uniformly relied on Jacobson's framework to analyze emergency public health measures put in place to curb the spread of coronavirus") (collecting cases); McCarthy v. Cuomo, 20-CV-2124 (ARR), 2020 WL 3286530, at *3 (E.D.N.Y. June 18, 2020) (listing COVID-19 cases employing Jacobson standard); see also In re Abbott, 954 F.3d at 783-84 (finding that "[t]he Supreme Court has repeatedly acknowledged [the Jacobson standard] and citing cases).

"clear or substantial" likelihood that they can successfully make either showing.   <u>Yang</u>, 960 F.3d at 127-28.

### c. Plaintiffs have not demonstrated a "clear or substantial" likelihood that the 50-person limitation has "no real or substantial relation" to protecting public health or public safety.

The first question under <u>Jacobson</u> review is whether the challenged governmental action bears a "real or substantial relation" to the danger it is designed to combat.   At the outset, it must be noted that Plaintiffs do not argue or suggest that the Governor's Executive Orders are pretextual or subterfuge directed at any goal other than eradicating the coronavirus, which they agree is a public emergency that poses a significant risk to the public health and welfare.   <u>See</u> <u>Cassell v. Snyders</u>, 20 C 50153, 2020 WL 2112374, at *7 (N.D. Ill. May 3, 2020) (emphasizing that "<u>Jacobson</u> preserves the authority of the judiciary to strike down laws that use public health emergencies as a pretext for infringing individual liberties").   And Plaintiffs recognize that fundamental rights must sometimes cede for the public benefit.   (Complaint, ¶ 51.)   Nonetheless, Plaintiffs maintain that the 50-person limitation bears no real or substantial relation to protecting the public welfare and is arbitrary and unreasonable.

Plaintiffs first challenge the premise that large gatherings present an increased risk of COVID-19 transmission, characterizing the notion of a "super-spreader" event as a "myth that the State has started to spread in order to justify its lockdown on society."   <u>See</u> Memorandum of Law, Docket No. 4-5, p. 15.   Suggesting that the State's focus on large gatherings may be overreactive, they note that the CDC and states such as Maryland and New Hampshire recommend capacity-based regulation of large gatherings.   (<u>See</u> Reply

Declaration of Nicholas P. DeMarco, Esq. ("DeMarco Reply Decl."), Docket No. 33, ¶¶ 16-18 and Exhibits D-H.)   But New York is not required to respond to a public-health emergency the same as any other state, nor may the State's reliance on expert scientific advice that large gatherings promote increased transmission be second-guessed, for it is particularly when officials act "in areas fraught with medical and scientific uncertainties" that their latitude is "especially broad."   S. Bay United Pentecostal Church, 140 S. Ct. at 1613.   The State's chosen response is therefore entitled to deference.   See Jacobson, 197 U.S. at 30 ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be most effective for the protection of the public against disease . . . That [is] for the [State] to determine in the light of all the information it had or could obtain."); Connecticut Citizens Def. League, Inc. v. Lamont, No. 3:20-cv-646 (JAM), 2020 WL 3055983, at *11 (D. Conn. June 8, 2020) ("[C]ourts owe great deference to the protective measures ordered by government officials in response to the COVID-19 crisis, not simply because the virus has lethal consequences but also because the virus acts in unknown ways that engender uncertainty about what scope of protective measures are warranted.").

And this is true even if the State's choice proves wrong:

> The possibility that the belief may be wrong, and that science may yet show it to be wrong, is not conclusive; for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases.   In a free country, where the government is by the people, through their chosen representatives, practical legislation admits of no other standard of action, for what the people believe is for the common welfare must be accepted as tending to promote the

17

> common welfare, whether it does in fact or not.  Any other
> basis would conflict with the spirit of the Constitution, and
> would sanction measures opposed to a Republican form of
> government.

Jacobson, 197 U.S. at 35; see also S. Bay United Pentecostal Church, 140 S. Ct. at 1614

(instructing that unelected judges not accountable to the people must not second-guess

State action taken to combat a public-health crisis).

Plaintiffs next argue that the 50-person limitation is arbitrary and unreasonable.

Their position is simple: they see no distinction between their businesses, which serve

food and beverages to diners, and restaurants, which likewise serve food and beverages

to diners.  In their view, the risks of transmission in restaurants operating at 50%

capacity—which for some may exceed 50 people—is no less than the risks posed if they

too operate under the same conditions.  In fact, they contend that they are in a *better*

position to guard against spread of the coronavirus because they abide by all

recommended sanitization practices and their events are planned and private.  (See,

e.g., Reply Declaration of Laurie Clark ("Clark Reply Decl."), Docket No. 33-10, ¶¶ 4, 6-

8.)  By way of example, Plaintiffs point to the alleged irrationality of permitting Plaintiff

Avanti Mansion to hold three simultaneous events in its facility, each capped at 50 people

(150 people total), yet prohibiting it from hosting a single event for 51 people total.

(Declaration of Laurie Clark, Docket No. 4-6, ¶ 9.)  They thus contend that it is arbitrary

and unreasonable to permit restaurants to operate at 50% capacity—with no cap no

matter what their capacity—while Plaintiffs are subject to a 50-person limitation without

regard to capacity.

While undoubtedly frustrating and difficult to understand in the face of losing one's business, the State's distinction between restaurant dining and large public gatherings cannot be said to be random or without reason.   This is not simply a numbers game. Plaintiffs' venues are not similarly situated in all material respects to restaurants: they do not have similarly sized groups arriving and departing at the same time; they do not attract and foster the same types of patron interaction; and they do not serve their clientele for similar lengths of time.

The large gatherings Plaintiffs typically host—weddings, celebratory showers, religious celebrations, family reunions, funeral breakfasts, graduation parties, political events, etc.—are inherently different than typical restaurant outings.   Guests at such events arrive and depart at the same time; Restaurant goers arrive and depart at varying times.   (Zucker Decl., ¶¶ 19, 23.)   Guests at such events are generally family and friends who all know each other and closely interact and mingle together; Restaurant goers, other than the immediate party, are generally strangers who do not mix with one another.   (Id. ¶ 20.)   Guests at such events stay for extended periods of time; Restaurant goers generally stay for only so long as their meals last.   (Id. ¶ 21.)   In short: restaurants do not host the type of "super-spreader" events that the scientists and medical professionals upon whom the State has elected to rely believe pose a heightened risk for COVID-19 transmission.[5]   But Plaintiffs do.

Nonetheless, Plaintiffs' position finds some support in DiMartile v. Cuomo.   There,

---

[5] These distinctions also differentiate the large gatherings Plaintiffs typically host from graduation ceremonies, religious services, and protests, comparators that are even less compelling than restaurants.

the court enjoined the State defendants from enforcing the 50-person limitation against two soon-to-be-wed couples who challenged Executive Order 202.45 and its progeny on religious grounds.   See DiMartile, 2020 WL 4558711, at *11.   The facilities at issue operated as both public restaurants and private venues.   See id. at *10.   In granting injunctive relief, the court strayed from the religious claims and rejected the distinction between large gatherings and restaurant outings that Defendants raise here, finding "no discernable rational reason for limiting a wedding use of the venues to only 50 individuals when the individuals present at the wedding would be required to abide by the same safety rules applicable to ordinary diners."   Id. at *10; DiMartile v. Cuomo, 1:20-CV-859 (GTS/CFH), 2020 WL 4877239, at *4-6 (N.D.N.Y. Aug. 19, 2020) (denying motion to stay the preliminary injunction and further rejecting the State defendants' distinctions between large gatherings and restaurant outings).   The Second Circuit stayed the injunction on August 21, 2020, pending review by the next merits panel.   (Docket No. 29-5.)

This Court is not persuaded by DiMartile.   First, the decision of another district court is not binding precedent.   See Camreta v. Greene, 563 U.S. 692, 709 n.7, 131 S. Ct. 2020, 179 L. Ed. 2d 1118 (2011).   Second, the venues' rights were not before the court.   Third, DiMartile involved unique facts not found here; it involved hybrid facilities that acted as both restaurants and private venues.   See DiMartile, 2020 WL 4558711, at *11 ("this case presents a unique situation in that the Plaintiffs' chosen venues are already operating as functioning restaurants in addition to wedding venues and thus the unequal treatment is happening as a result of two different uses of the same venue").   Fourth, the DiMartile court specifically qualified its ruling, cautioning that "[the court] is not implying

20

that *any* wedding (particularly the typical wedding that existed before the COVID-19 pandemic) would be sufficiently similar to a typical dining experience." Id. Finally, this Court reads Jacobson to require more deference to State-chosen emergency measures than was afforded in DiMartile.

And there is yet another significant distinction between Plaintiffs' venues and restaurants: Defendants deem the restaurant industry an "essential" service that must be permitted to operate because it is a significant food supply source for New Yorkers (id. ¶ 40), a designation within the State's discretion. See Dark Storm Indus. LLC v. Cuomo, 1:20-CV-360 (LEK/ATB), 2020 WL 3833107, at *14 (N.D.N.Y. July 8, 2020) (finding the "essential v. non-essential' designation a policy decision that courts are "loathe to second-guess"). Defendants have therefore permitted restaurants to operate under restrictions dictated by infection rates to avoid eliminating a vital source of food supply. (Id. ¶¶ 40, 41, 47, 49.) As private venues serving private parties, banquet and catering facilities do not provide the same essential food service as restaurants. The State therefore need not tolerate the risks posed by individuals congregating and mingling at large, private gatherings as it must the risks posed by seemingly similar activity in restaurants providing essential food services. Again, this is a policy decision reserved to the State under its police power. See Jacobson, 197 U.S. at 30.

Finally, Plaintiffs suggest that the Governor's Executive Orders are no longer needed because sectors of the state continue to re-open and infection numbers continue to improve. While these improvements are promising—and some might say directly attributable to the very type of Orders that Plaintiffs challenge—Jacobson's reach does

21

not end until the epidemic *ends*.   See Cassell, 2020 WL 2112374, at *7.   At this point, the end is not in sight.

Based on the evidence submitted, this Court finds that Plaintiffs have failed to demonstrate a "clear or substantial" likelihood that the 50-person limitation in Executive Order 202.45 and its progeny bear "no real or substantial relation" to protecting public health and safety or are arbitrary or unreasonable.   To the contrary, Defendants' 50-person limitation on large gatherings is based on expert scientific and medical advice and is directly related to protecting the citizenry against the mass transmission of COVID-19. Accordingly, the Executive Order passes muster under the first Jacobson prong.   See Santore v. Cuomo, 1:20-CV-850, Docket No. 14, p. 15 (N.D.N.Y. Aug. 14, 2020) (finding that "gathering limits are emergency measures which, even if they did curtail constitutional rights, have a 'real or substantial' relation to the public health crisis"); Geller v. Cuomo, 20 Civ. 4653 (ER), 2020 WL 4463207, at *11 (S.D.N.Y. Aug. 3, 2020) (rejecting First Amendment challenge to Executive Order 202.45 and finding "no difficulty in concluding . . . that the restriction was enacted to protect the public health and bears a real and substantial relation to the public safety concerns at issue").

> ### d. Plaintiffs have not demonstrated a "clear or substantial" likelihood that the 50-person limitation is "beyond all question, a plain palpable invasion of rights."

The second question under Jacobson review is whether the challenged governmental action is "beyond all question, a plain palpable invasion of rights."   197 U.S. at 31.   Although asserting a number of causes of action in their complaint, Plaintiffs focus their motion for preliminary injunction on their Equal Protection and Takings Clause

claims under the Fifth and Fourteenth Amendments.  They have not demonstrated, however, a "clear or substantial" likelihood that it is "beyond all question" that enforcement of Executive Order 202.45 invades their rights asserted under either amendment.

First, the Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  It is "essentially a direction that all persons similarly situated be treated alike."  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985); see also Sound Aircraft Servs., Inc. v. Town of E. Hampton, 192 F.3d 329, 335 (2d Cir.1999) ("[a]t its core, equal protection prohibits the government from treating similarly situated persons differently").  The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).  Where a plaintiff does not claim membership in a protected class, he or she may pursue a "selective-enforcement" or "class-of-one" claim. See Rankel v. Town of Somers, 999 F. Supp. 2d 527, 544 (S.D.N.Y. 2014).  Under either theory, the plaintiff must demonstrate that he or she was treated differently from other similarly situated individuals.

Plaintiffs contend that the State has arbitrarily and unreasonably treated them differently from restaurants, which they allege are similarly situated entities.  But for all

23

of the reasons set forth above, the record evidence establishes that Plaintiffs and restaurants are *not* similarly situated in all material respects.   This forecloses Plaintiffs' equal protection claims.

Second, the Takings Clause of the Fifth Amendment provides that "nor shall private property be taken for public use, without just compensation."   U.S. Const. amend. V.   This clause applies to the states through the Fourteenth Amendment.   See Kelo v. City of New London, Connecticut, 545 U.S. 469, 472 n. 1, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005) (citing B.R. Co. v. Chicago, 166 U.S. 226, 17 S. Ct. 581, 41 L. Ed. 979 (1897)). The Takings Clause imposes two conditions on a state's authority to take private property: "the taking must be for a public use and just compensation must be paid to the owner." Brown v. Legal Found. of Wash., 538 U.S. 216, 231, 123 S. Ct. 1406, 1417, 155 L. Ed. 2d 376 (2003) (internal quotations omitted); see First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 314, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987) (Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power").   The purpose of the Takings Clause is to prevent the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Armstrong v. United States, 364 U.S. 40, 49, 80 S. Ct. 1563, 4 L. Ed. 2d 1554 (1960).

Generally speaking, there are two types of takings.   The quintessential taking is one where "a direct government appropriation or physical invasion of private property" occurs.   Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 537, 125 S. Ct. 2074, 161 L .Ed. 2d 876 (2005); see Palazzolo v. Rhode Island, 533 U.S. 606, 617, 121 S. Ct. 2448, 2457,

150 L. Ed. 2d 592 (2001) ("The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use."); see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 321-323, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002) (describing the Supreme Court's jurisprudence involving physical takings to be "as old as the Republic").

The other type of taking is the one first recognized in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922), where "the Court recognized that there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs." Palazzolo, 533 U.S. at 617 (discussing Pennsylvania Coal).   This type of taking is commonly referred to as a "regulatory taking."   Plaintiffs assert a regulatory taking here.

"Regulatory takings are based on the principle that 'while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking.'" Ganci v. New York City Transit Auth., 420 F. Supp. 2d 190, 195 (S.D.N.Y. 2005) (citing Pennsylvania Coal, 260 U.S. at 415).   There are two types: categorical and non-categorical.   A categorical regulatory taking involves "the extraordinary circumstance when *no* productive or economically beneficial use of [property] is permitted."   See Tahoe-Sierra, 535 U.S. at 330 (quoting Lucas v. S. Carolina Coastal Council, 505 U.S. 1003, 1017, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992)) (emphasis in original).   All other regulatory takings are non-categorical: those involving "[a]nything less than a complete elimination of value, or a total loss."   Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978).

Analyzing non-categorical takings under Penn Central "requires an intensive *ad hoc* inquiry into the circumstances of each particular case." Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 375 (2d Cir. 2006). Three factors are weighed: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224-25, 106 S. Ct. 1018, 89 L. Ed. 2d 166 (1986).

Plaintiffs allege a categorical regulatory taking in their complaint. (Complaint, ¶¶ 104-117.) They maintain that Governor Cuomo's Executive Orders "have resulted in Plaintiffs losing all economically viable use of their businesses and property." (Id. ¶ 111.) Yet Plaintiffs elsewhere concede that the Executive Orders do not preclude them from hosting events of 50 or fewer people, and in fact, several Plaintiffs admit that they are scheduled to host such events. (Id. ¶¶ 45, 53, 112; Clark Reply Decl., ¶ 14 (six conforming events scheduled); Reply Declaration of Joseph Kloc, Docket No. 33-13, ¶ 11 (four conforming events scheduled).) Any categorical claim would therefore fail, since Plaintiffs admit that they are not precluded from *all* economically beneficial uses of their property. See Tahoe-Sierra, 535 U.S. at 330 (providing that a plaintiff must show *no* productive or economically beneficial use of his or her property to sustain a categorical regulatory takings claim).

And Plaintiffs are unlikely to fare any better on a non-categorical regulatory takings claim. First, the Executive Orders are temporary and do not preclude all economic use of Plaintiffs' property. See Buffalo Teachers Fed'n, 464 F.3d at 375 (finding that

temporary and partial nature of wage freeze weighed against finding a taking); <u>Kabrovski v. City of Rochester, N.Y.</u>, 149   F. Supp. 3d 413, 425 (W.D.N.Y. 2015) ("[I]t is well settled that a 'taking' does not occur merely because a property owner is prevented from making the most financially beneficial use of a property.") (citation omitted).   Second, although Plaintiffs' investment-backed expectations are surely disrupted by the 50-person limitation, the Executive Orders are "a negative restriction rather than an affirmative exploitation by the state," which also weighs against a taking.   <u>See</u> <u>Buffalo Teachers Fed'n</u>, 464 F.3d at 375.   Third, and perhaps most importantly, the State "does not physically invade or permanently appropriate any of [Plaintiffs'] assets for its own use." <u>Connolly</u>, 475 U.S. at 225.   Rather, the character of the government action here is a temporary and proper exercise of the police power to protect the health and safety of the community, which weighs against a taking.   <u>See</u> <u>id.</u> (noting that "interference with the property rights of an employer aris[ing] from a public program that adjusts the benefits and burdens of economic life to promote the common good" does not constitute a compensable taking under Supreme Court precedents); <u>see also</u> <u>Lebanon Valley Auto Racing Corp. v. Cuomo</u>, 1:20-CV-804 (LEK/TWD), 2020 WL 4596921, at *8 (N.D.N.Y. Aug. 11, 2020) (finding that the character of COVID-related Executive Orders strongly favors the State defendants).   The <u>Penn Central</u> analysis therefore weighs against finding a non-categorical regulatory taking.

For all of these reasons, this Court finds that Plaintiffs do not demonstrate "beyond all question, a plain palpable invasion" of their rights under the Equal Protection and Takings Clauses.   <u>Jacobson</u>, 197 U.S. at 31.   Executive Order 202.45 and its progeny

therefore pass muster under the second <u>Jacobson</u> prong.   <u>See</u> <u>Santore</u>, 1:20-CV-850,

Docket No. 14, p. 15 (finding that "gathering limits are not 'beyond all question, a plain

palpable invasion of rights secured by the fundamental law'").

### 2. Plaintiffs do not make a strong showing of irreparable harm or establish that the balance of equities and public interest weigh in their favor.

While this Court need not consider the remaining preliminary injunction factors,

<u>see</u> <u>McCarthy v. Cuomo</u>, 20-CV-2124 (ARR), 2020 WL 3286530, at *3 (E.D.N.Y. June

18, 2020), it does so briefly to highlight that they too counsel against injunctive relief.

First, Plaintiffs have not made the required "strong showing" of irreparable harm.

Citing <u>Jolly v. Coughlin</u>, they first argue that a presumption of irreparable harm flows from

the mere assertion of a constitutional violation.   76 F.3d 468, 482 (2d Cir. 1996).   But

"the favorable presumption of irreparable harm arises only *after* a plaintiff has shown a

likelihood of success on the merits of the constitutional claim," which Plaintiffs have not

done.   <u>Page</u>, 2020 WL 4589329, at *6 (citing <u>Jolly</u>, 76 F.3d at 482 ("[W]e agree with the

district court that the plaintiff has shown a substantial likelihood of success on his Eighth

Amendment claim.   The district court *therefore* properly relied on the presumption of

irreparable injury that flows from a violation of constitutional rights.") (emphasis added);

<u>see also</u> <u>Turley v. Giuliani</u>, 86 F Supp. 2d 291, 295 (S.D.N.Y. 2000) (noting that when

irreparable harm is premised on a constitutional violation, "the two prongs of the

preliminary injunction threshold merge into one . . . to show irreparable injury, plaintiff

must show a likelihood of success on the merits").

Moreover, while the economic impact of the 50-person limitation undoubtedly hits

hard, the Executive Orders are temporary; Plaintiffs are permitted to continue business operations within the confines of the Executive Orders; and no documentary evidence has been submitted to support Plaintiffs' claims of near insolvency.   See Lebanon Valley, 2020 WL 4596921, at *8.   The necessary "strong showing" of irreparable harm is therefore absent.

Second, Plaintiffs have not demonstrated that the balance of equities and public interest weigh in their favor.   Weakening the State's response to a public-health crisis by enjoining it from enforcing measures employed specifically to stop the spread of COVID-19 is not in the public interest.   Nor does the balance of equities in permitting Plaintiffs to host gatherings larger than 50 people outweigh the general welfare of the state and the pressing need to eradicate this insidious disease.   The balance of equities and the public interest therefore favor Defendants.   See Page, 2020 WL 4589329, at *10 (finding that balance of equities and public interest weighed against enjoining an Executive Order requiring self-quarantine because "the injunctive relief sought . . . would also upset a major component of the State's current public health response to COVID-19"); Ass'n of Jewish Camp Operators, 2020 WL 3766496, at *21 (denying request to require the opening of overnight summer camps as not in the public interest "[g]iven the unprecedented nature of the COVID-19 pandemic, the deadly nature of the virus itself, the lack of a vaccine . . ., and lack of scientific agreement about its transmission"); Geller, 2020 WL 4463207, at *11 (concluding that Executive Order 202.45 "promotes a substantial government interest . . ., namely, to mitigate the harm and spread of the pandemic, which would be 'achieved less effectively' absent the gathering restrictions")

29

(citation omitted).

* * * * *

Because Executive Order 202.45 passes scrutiny under Jacobson, it must be upheld as a valid exercise of the police power.   Consequently, Plaintiffs cannot demonstrate a clear or substantial likelihood of success on any of their claims, nor have they made the required strong showing of irreparable harm or established that the balance of equities and public interest weigh in their favor.   Plaintiffs' motion for preliminary injunction is therefore denied.

## IV. CROSS-MOTIONS TO DISMISS

Defendants have moved to dismiss Plaintiffs' complaint on various grounds. Without reaching the merits of those individual arguments, this Court finds that Jacobson stands as a formidable obstacle to each of the claims asserted in the complaint.   Since the complaint contains no claims pleaded under the Jacobson framework, it is subject to dismissal.   See, e.g., Page, 2020 WL 4589329, at *12 (dismissing claims, in part, for "fail[ure] to state a plausible claim for relief under the deferential framework of Jacobson" and describing Jacobson as a "complete roadblock" to the plaintiff's claims).

But because this Court cannot determine as a matter of law on the record before it that none of Plaintiffs' claims would survive if re-pleaded under Jacobson, it will afford Plaintiffs the opportunity to file an amended complaint.   See Fed. R. Civ. P. 15 (a)(2) (requiring that leave to amend be freely given when justice so requires).   If Plaintiffs do not file an amended complaint within 14 days of the entry date of this decision, this case will be closed without further order of this Court.

## V. CONCLUSION

This Court is sympathetic to Plaintiffs' plight.   They see others in the food-service industry with an opportunity to survive this epidemic by operating at 50% capacity, yet they cannot.   They are willing to engage in the same protective protocols that allow others in the industry to operate as safely as possible, yet they cannot.   They have worked hard to build their businesses, for some their life's work, and have prepared their facilities to reopen safely, yet they cannot.   Even in the face of a foe as fierce as COVID-19, one can understand why Plaintiffs implore this Court to engage in a more searching scrutiny of the wisdom, effectiveness, and need for the State's emergency measures, yet it cannot.

The grim fact is that New York and the rest of the world are engaged in a global battle to stave off COVID-19.   While it is no secret that reasonable minds can and do differ over what defensive measures might be most effective and desirable, there is little room for debate in this forum.   Jacobson instructs that it is "no part of the function of a court" to determine which measures are "likely to be the most effective for the protection of the public against disease."   Jacobson, 197 U.S. at 30.   Rather, it is for the State to determine and implement, with wide latitude, such emergency measures as it deems reasonably necessary to protect the public welfare.   This Court would usurp the State's police power and the function of another branch of government if it were to engage in Monday-morning-quarterbacking or substitute its judgment for that of the State's.

Thus, no matter how tempting it may be to grant Plaintiffs the relief they seek to provide them a fighting chance at survival, Jacobson forbids it.   Quite simply, this Court

31

is constrained by the standard of review that compels the result reached herein. Governor Cuomo's Executive Order satisfies minimal constitutional requirements and must be upheld.   Plaintiffs' motion for preliminary injunction is therefore denied. Defendants' cross-motions to dismiss are granted, with leave afforded to Plaintiffs to amend their complaint.

## VI.   ORDERS

IT HEREBY IS ORDERED, that Plaintiffs' Motion for Preliminary Injunction (Docket No. 4) is DENIED.

FURTHER, that the Cross-Motions to Dismiss (Docket Nos. 23, 29) are GRANTED.

FURTHER, that Plaintiffs are granted leave to amend their complaint within 14 days of the entry date of this decision.

FURTHER, that if Plaintiffs do not file an amended complaint within 14 days of the entry date of this decision, the Clerk of Court is directed to CLOSE this case without further order of this Court.

SO ORDERED.

Dated:      September 10, 2020
            Buffalo, New York

s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge

32